**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**


| | | |
|---|---|---|
| **CHARLES ISELEY,** | : | **CIVIL NO. 1:CV-02-2006** |
| **Plaintiff,** | : | |
| | : | **(Chief Judge Kane)** |
| **v.** | : | |
| | : | |
| **JEFFREY BEARD, <u>et al.</u>,** | : | |
| **Defendants** | : | |


**<u>MEMORANDUM</u>**

Charles Iseley ("Iseley"), filed this civil rights action pursuant to 42 U.S.C. § 1983 on

November 5, 2002. The matter proceeds on an amended complaint filed on July 9, 2003. (Doc.

No. 76.) Named as defendants are various Department of Corrections ("DOC") officials,

employees at the State Correctional Institution in Coal Township ("SCI-Coal"), Pennsylvania

and the State Correctional Institution in Huntingdon ("SCI-Huntingdon"), Pennsylvania, and

prison medical providers. Iseley asserts claims of denial of medical treatment in violation of the

Eighth Amendment for the following illnesses: Hepatitis-C ("HCV"); fibromyalgia ("FM"),

chronic fatigue syndrome ("CFS") and rheumatoid arthritis ("RA"). He further asserts violation

of the Americans with Disabilities Act[1] ("ADA"), the Equal Protection clause, and state laws

with regard to his medical care. Presently before the Court is a motion for summary judgment

filed by the following prison medical providers from SCI-Huntingdon: Dawn Mills, physician's

assistant; Dr. Paul Roemer; and their employer, Wexford Health Sources, Inc. ("Wexford"), the

former contractual health care provider at SCI-Huntingdon.[2] After careful consideration, and for

---

[1] <u>See</u> Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213.

[2] There are two (2) additional groups of defendants that have filed motions for summary
judgment in this action. A motion for summary judgment filed by Defendants PHS, Inc., ASG,

the reasons that follow, the motion will be granted.

## I.     Background

The incidents in the amended complaint occurred during Plaintiff's confinement at SCI-
Coal Township and SCI-Huntingdon, and concern his care and treatment for the illnesses set
forth above.  On July 9, 2004, Defendants Mills, Roemer and Wexford Health Sources, Inc. filed
a motion for summary judgment.  (Doc. No. 123.)  The Court granted the motion on the basis
that collateral estoppel applied to bar Plaintiff's amended complaint.  (Doc. No. 163.)  In
addition, the Court dismissed Plaintiff's amended complaint under 28 U.S.C. § 1915(e)(2)(B)(ii)
for failure to state a claim as to the remaining defendants.  On March 31, 2006, the Court denied
Plaintiff's motion to alter judgment and for reconsideration.  (Doc. No. 177.)

Following Plaintiff's appeal to the Third Circuit Court of Appeals, an opinion was issued
on June 27, 2007, affirming in part, vacating in part, and remanding the matter for further
proceedings.  (Doc. No. 185.)  The Third Circuit affirmed this Court's finding that collateral
estoppel applied to bar the relitigation of Plaintiff's claims of deliberate indifference to his
serious medical needs concerning denial of treatment for his Hepatitis-C, the DOC's protocol for
Hepatitis-C treatment and required psychiatric screening, and consent forms for such treatment.
The case was remanded with regard to all of Plaintiff's other claims.  Id.

In a Memorandum and Order dated March 5, 2008, this Court clarified the issues to be
considered on remand.  (Doc. No. 249.)  Specifically, the following issues are before this Court:
(1) the failure of Defendants to treat Plaintiff's FM, CFS and RA as constituting cruel and

---

Inc. and Joseph Kort, M.D. was granted on June 15, 2009.  (Doc. No. 348.)  A motion for
summary judgment filed by numerous Corrections' Defendants (Doc. No. 274) is presently
pending before the Court, and will be addressed in a separate Memorandum and Order.

unusual punishment in violation of the Eighth Amendment; (2) the denial of medical treatment in violation of the Americans with Disabilities Act relating to all of Plaintiff's illnesses; (3) the denial of medical treatment in violation of Plaintiff's Equal Protection rights relating to all of his illnesses; and (4) various state law claims.[3]

Presently before the Court is the motion for summary judgment filed by Defendants Mills, Roemer and Wexford Health Sources, Inc. Only the allegations relevant to these Defendants will be set forth.

Plaintiff states that in 1998 he tested positive for HCV, a serious medical condition. (Doc. No. 76, Am. Compl. ¶ 26.) He unsuccessfully sought treatment for the condition in early 1999 and thereafter. He maintains that he was later diagnosed by a doctor as suffering from fibromyalgia, chronic fatigue syndrome, rheumatoid arthritis and degenerative disc disease. He claims to suffer from symptoms including nausea, vomiting, debilitating chronic fatigue, severe muscle and joint pain, weight loss, weakness, dizziness, abdominal pain, migraine headaches, liver damage, difficulty with urination, memory loss, insomnia and difficulty performing everyday activities. (Id. ¶ 35.)

While incarcerated at SCI-Huntingdon from 2001-2002, Plaintiff claims he was denied treatment for HCV by Defendants Beard, Bitner, Kyler, Baney, Everhart, Yarger, Roemer, Showalter, Moe and Wexford because his mental illness caused him to fall under the exclusionary criteria of the DOC HCV protocol. (Id. ¶ 60.) As such, DOC policy prohibited him from receiving treatment unless he signed a waiver of his constitutional rights and agreed to

---

[3] As such, with respect to Defendants Mills, Roemer and Wexford, Hepatitis-C remains an issue in this case only as to Plaintiff's causes of actions for violations of the ADA, the Equal Protection clause and with respect to the various state law claims.

become a mental health patient.  Plaintiff claims, however, that the exclusionary criteria did not apply to him because he is not mentally ill or was ever diagnosed as being mentally ill.  (Id. ¶¶ 60-62.)

Plaintiff contends that Defendant Mills denied him medical treatment for CFS, claiming that CFS is only serious for individuals who are not incarcerated.  He states that Mills found no medical reason to support his claim of CFS, but argues that Mills is not a doctor, and therefore not qualified to make such a diagnosis.  Plaintiff also contends that Mills never examined him, and failed to use skill to treat his HCV and CFS, despite having a duty to do so.  (Id. ¶¶ 65-68.)

Plaintiff also alleges that he was seen by Defendant Roemer while at SCI-Huntingdon, and requested treatment for HCV, FM, RA and CFS.  He claims Roemer refused to refer him to a specialist regarding his HCV, and failed to record his complaints in the medical records. Plaintiff also claims Roemer violated his rights when he referred to him as a "nigger."  (Id. ¶¶ 72-73.)

In the amended complaint Plaintiff further contends that his "conditions" qualify as disabilities, and, as such, Defendants violated his rights under the Americans with Disabilities Act.  (Id. ¶89.)  He also sets forth various state law claims including negligence, invasion of privacy, intentional infliction of emotional distress and medical malpractice.  He seeks compensatory, punitive, declaratory and injunctive relief.  (Id. ¶ 103.)

## II.     STANDARD OF REVIEW

Summary judgment will be granted if the record establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ P. 56(c); Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).  In considering a

motion for summary judgment, inferences from the underlying facts must be viewed in the light most favorable to the nonmoving party. <u>P.N. v. Clementon Bd. of Educ.</u>, 442 F.3d 848, 852 (3d Cir. 2006).

Rule 56(c) imposes a burden on the moving party to point to an absence of evidence supporting the nonmoving party's case. <u>Celotex Corp. v. Caltrett</u>, 477 U.S. 317, 325 (1986). Once the moving party has met this burden, the burden shifts to the nonmoving party, who "may not rely merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e)(2); <u>Saldana</u>, 260 F.3d at 232. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). The opposing party must "set out specific facts showing a genuine issue for trial." Fed. R Civ. P. 56(e)(2). Issues of fact are "genuine only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." <u>Childers v. Joseph</u>, 842 F.2d 689, 693-94 (3d Cir. 1988). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment. <u>Id</u>. Even so, "all that is required [by Rule 56(e)(2)] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." <u>First Nat. Bank of Ariz. v. Cities Service Co.</u>, 391 U.S. 253, 288-89 (1968). Unsubstantiated arguments made in briefs are not considered evidence of asserted facts. <u>Versarge v. Township of Clinton</u>, 984 F.2d 1359, 1370 (3d Cir. 1993). Allegations made without any evidentiary support may be disregarded. <u>Jones v. UPS</u>, 214 F.3d 402, 407 (3d Cir. 2000). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson v. Liberty</u>

Lobby, Inc., 477 U.S. 242, 249 (1986).

## III.   DISCUSSION

Summary judgment has already been granted in favor of Defendants Mills, Roemer and Wexford with respect to all claims regarding the denial of HCV treatment, the DOC HCV protocol, and the required psychiatric screening and consent forms.  (Doc. No. 185 at 5.)  Thus, remaining against said Defendants are the (1) deliberate indifference with respect to treatment of FM, CFS and RA claims; (2) the ADA claim; (3) an Equal Protection claim and (4) the state law claims.

Defendants move for summary judgment on all grounds.  In support of their motion, they submit a brief (Doc. No. 281) and a statement of material facts with attached supporting evidentiary materials (Doc. No. 282).[4]  The materials submitted consist of medical progress notes (Doc. No. 282-2), physician's orders, lab reports and other medical records (282-3); the Affidavit of David Rowe, D.O. and Chief Medical Officer for Wexford Health Sources, Inc. during the relevant time period with attached exhibits (Doc. No. 282-4 - 282-6); an amended complaint in the case of Iseley v. Horn, No. 00-cv-4839 (E.D. Pa.)(Doc. No. 282-7); the declarations made under penalty of perjury with attached exhibits of Marva Cerullo, Corrections Health Care Administrator at SCI-Mahanoy (Doc. No. 282-8 - 282-9); Wilma Sewell, Health Care Administrator at SCI-Coal (Doc. No. 282-10); and Jane Dando, R.N. at SCI-Coal (Doc. No.

_____

[4]  In citing to the record, Defendants reference the evidentiary materials attached to their Statement of Material Facts (Doc. No. 282) as Exhibits A and B.  However, when counsel for Defendants electronically filed the Statement of Material Facts and attached evidentiary materials, the supporting materials were docketed as subparts of the Statement of Facts (Doc. No. 282-2 through 282-12.)  For ease of reference, the Court will cite to the record in the same format as appears on the docket.

282-11).  Also submitted are excerpts from Plaintiff's deposition conducted in the case of <u>Iseley v. Dragovitch, et al.</u>, No. 00-cv-4839 (E.D. Pa.)(Doc. No. 282-12).

A.      **Eighth Amendment Medical Care Claims**

In order to state an Eighth Amendment medical claim, a plaintiff must show "(i) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need."  <u>Natale v. Camden Cty. Correctional Facility</u>, 318 F.3d 575, 582 (3d Cir. 2003); <u>see also</u> <u>Rouse v. Plantier</u>, 182 F.3d 192, 197 (3d Cir. 1999).

A prison official acts with deliberate indifference to an inmate's serious medical needs when he "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).  Thus, a complaint that a physician or a medical department "has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. . . ."  <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976).

As such, a "medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most it is medical malpractice."  <u>Id.</u>, 429 U.S. at 107.  "[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."  <u>Brown v. Borough of Chambersburg</u>, 903 F.2d 274, 278 (3d Cir. 1990).  Further, a doctor's disagreement with the professional judgment of another doctor is not actionable under the Eighth Amendment.  <u>See</u> <u>White v. Napoleon</u>, 897 F.2d 103, 110 (3d Cir. 1990).  In sum, negligence, unsuccessful medical treatment, or medical malpractice does not give rise to a civil rights cause of action, and an inmate's disagreement with medical treatment is

insufficient to establish deliberate indifference. See Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993).

In Rouse, 182 F.3d 192 (3d Cir. 1999), the Court of Appeals for the Third Circuit set forth the standard necessary to establish a claim for deliberate indifference to a prisoner's medical needs. The Court stated:

> The Eighth Amendment prohibits the imposition of unnecessary and wanton infliction of pain contrary to contemporary standards of decency. In Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed. 2d 251 (1976), the Supreme Court held that the Eighth Amendment's prohibition against cruel and unusual punishment requires prison officials to provide basic medical treatment to those whom it has incarcerated. The Court articulated the standard to be used: In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment. Id. at 106, 97 S.Ct. 285. Therefore, to succeed under these principles, plaintiffs must demonstrate (1) that the defendants were deliberately indifferent to their medical needs and (2) that those needs were serious.... It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute "deliberate indifference." As the Estelle Court noted: "[I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind,'" Id. at 105, 97 S.Ct. 285... Deliberate indifference, therefore, requires obduracy and wantonness. . . which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk. . . .

Id. at 197 (some internal citations and quotations omitted).

Defendants move for summary judgment with respect to Plaintiff's claims of the denial of medical treatment for fibromyalgia, chronic fatigue syndrome and rheumatoid arthritis on the basis that the record fails to reveal any deliberate indifference on their parts. Defendants set forth an extensive statement of material facts supported by medical records spanning the time

period from 1999 to the beginning of 2003, outlining the history of Plaintiff's comprehensive medical care. These submissions reveal the following.

In February of 1999, while confined at SCI-Mahanoy, Plaintiff was seen by medical staff with respect to his Hepatitis-C condition. (Doc. No. 282-2 at 2.) In March of 1999, Plaintiff complained of fatigue to a physician's assistant. He was not in any acute distress, and the assessment was HCV. (Id.) He was put on medical lay-in for 48 hours, after it was ordered he be seen by a physician regarding his request for no work/activities. (Id.)

On March 24, 1999, Plaintiff was diagnosed with mild asthma and treatment was prescribed. (Id.) In April of 1999, complained to a doctor at SCI-Mahanoy that he was sick all the time, had an upset stomach, was tired and had no appetite. The physician's assessment was s "history of HCV." Lab work was ordered and a multivitamin prescribed. (Id. at 4, 44.)

Later the same month, Plaintiff complained of feeling tired and experiencing pain in his right neck and upper back. The physician's assessment was "tired - history of hepatitis," and right-sided cervical and shoulder fibromyalgia. Motrin and Robaxin were ordered to treat the soreness, and Plaintiff was given a Vitamin B-12 injection. (Id.)

In May of 1999, Plaintiff reported feeling slightly better and was instructed to return in 7 weeks. (Id. at 5, 44.) He was seen in early June with respect to his asthma condition. On June 21, 1999, the doctor noted that Plaintiff did not complain of any new symptoms and his heart, lungs, abdomen and extremities were normal. The doctor's diagnosis was "possible chronic fatigue syndrome." Plaintiff was ordered to take a daily multivitamin and a follow-up appointment was conducted on July 19, 1999. The examination was normal, and the assessment was chronic fatigue syndrome. Plaintiff received a Vitamin B-12 shot, and was scheduled for

shots every six (6) weeks over the next year.  (Id. at 6, 45 .)   In an examination on September 2, 1999, Plaintiff had no complaints.  (Id. at 6-7.)

Between September of 1999 and March of 2000, Plaintiff received routine treatment with respect to his asthma condition.  There were also several incidents where he refused treatment in the form of a flu vaccine, a B-12 injection, and attendance at both the asthma and Hepatitis-C clinics.  He refused to sign refusal of treatment forms.  (Doc. No. 282-2 at 7-13; Doc. No. 282-3 at 2-6.)

On March 14, 2000, Plaintiff was transferred to SCI-Coal Township.  On admission he informed the nurse he had asthma, arthritis and HCV.  (Doc. No. 282-2 at 13.)  Dr. Joseph Kort, another Defendant in this action, evaluated his asthma condition and continued the inhaler prescription.  On March 20, 2000, Plaintiff was seen for unrelated complaints regarding ear pain.  (Id. at 14.)

On April 20, 2000, Plaintiff complained to a physician's assistant that he was suffering from fatigue and headaches.  A physical exam of Plaintiff was normal, and revealed he was not in any acute distress.  Motrin was prescribed.  (Doc. No. 282-2 at 14.)

On April 25, 2000, Plaintiff had blood drawn for liver function tests.  He was seen by a physician's assistant on May 2, 2000 complaining of joint pain, fatigue, weakness, abdominal pain and nausea/dizziness for "several years."  At the time of the exam, he was experiencing no symptoms and was not in distress.  The exam was normal and the assessment was fatigue, with a note that Plaintiff had a history of HCV.  Plaintiff was thereafter examined by Dr. Kort a few days later and complained of fatigue.  Kort discussed Hepatitis-C with him as well as the treatment and complications from treatment.  Plaintiff indicated he wished to be treated.  As

such, Kort ordered the necessary blood work and psychological consult to be evaluated for Hepatitis-C treatment.  (Doc. No. 282-2 at 15.)

In May and June of 2000, Plaintiff was primarily seen for his asthma and Hepatitis- C conditions.  Dr. Kort reviewed the results of lab work and his assessment was "indecisive about [Hepatitis-C] treatment."  Thyroid blood tests were also conducted on May 23, 2000.  (Id. at 16.) On June 7, 2000, Plaintiff had a check-up for his chronic conditions and no problems were noted and he voiced no complaints.  Another check up occurred on July 5, 2000.  The only change ordered was with respect to a new medication pack related to an "alteration in respiratory status."  (Id. at 19.)

Plaintiff's medical treatment from November 21, 2000 through March 1, 2001 while at SCI-Coal Township is fully set forth in this Court's Memorandum of June 15, 2009, and will not be reiterated herein.  (Doc. No. 348 at 16-18.)  The care was all related to Plaintiff's asthma check ups and his HCV condition.  It was during this time period when Plaintiff initially refused to have the necessary quantitative blood testing performed,[5] and refused to submit to the required psychological evaluation required prior to the start of Hepatitis-C treatment.  By March 1, 2001, the last entry in the medical records at SCI-Coal, Plaintiff was still refusing to submit to the psychological evaluation.  As such, it was noted that his Hepatitis-C illness would continued to be monitored.  (Doc. No. 282-2.)

On March 21, 2001, Plaintiff was transferred to SCI-Huntingdon.  The following day, he was seen by Dr. Kimber who noted Plaintiff was on an inhaler and had an elevated blood pressure.  The asthma clinic and blood pressure monitoring 3 times per week for a month were

_____

[5]  Plaintiff ultimately did agree to have the blood drawn on January 23, 2001.

prescribed.  Kimber further noted that Plaintiff had HCV, and needed to be evaluated for

treatment.  (Id.)  As such, he tickled Esther Miller regarding Hepatitis-C.  (Doc. No. 282-3 at

13.)            On April 23, 2001, Plaintiff was seen by Defendant Mills, a physician's assistant,

for blood pressure follow-up.  She noted he was in no acute distress and had a normal bp.  He

was directed to return to medical as needed.  (Doc. No. 282-2 at 25.)  Two days later Plaintiff

was seen again by Kimber, who noted his asthma as stable.  A follow-up with the asthma clinic

was ordered.  No further medical treatment was sought by Plaintiff for three (3) months.

On July 16, 2001, Plaintiff was seen by Defendant Roemer, who found no wheezing,

shortness of breath or cough.  (Id. at 26.)  He ordered a chest x-ray and a follow-up on Plaintiff's

asthma.  The inhaler was re-prescribed, and a flu shot ordered.   (Doc. No. 282-3 at 15.)  On July

20, 2001, Plaintiff saw physician assistant John Cain regarding his empty inhaler.  Orders were

issued to replace the inhaler.  Three days later Plaintiff complained he had not received a

replacement yet.  Cain brought the matter to the attention of the nursing staff.  (Doc. No. 282-2

at 26.)  On August 1, 2001, Plaintiff refused his flu shot, but did sign a refusal of treatment form.


From August 8, 2001 through the end of October 2001, Plaintiff was seen by the SCI-

Huntingdon medical staff on six (6) occasions, all related to his asthma condition.  (Id. at 27-28.)

Following a brief transfer to SCI-Waymart from October 30, 2001 until November 14, 2001,

Defendant Roemer conducted a complete examination of Plaintiff and chart review on November

15, 2001.  Plaintiff voiced no complaints.  Examination of his lungs, thyroid, lymph nodes, heart,

abdomen, pupils were normal.  Roemer's assessment was "Hep C positive - stable; asthma -

stable."  Orders were issued with respect to his asthma treatment.  Plaintiff was also informed

that he was on the upper limits of a normal weight for his height.  Roemer noted in the medical chart that Plaintiff became "very angry I did not renew a high calorie diet.  Inmate asked to leave because of anger."  (Doc. No. 282-2 at 30; Doc. No. 282-3 at 17.)

On November 16, 2001 and December 29, 2001, Plaintiff presented to sick call with regard to his asthma condition.  In early January, 2002, he was seen by Dr. McGarvie complaining of asthma and arthritis pain in his hands.  McGarvie's assessment was "complaints of asthma, complaints of arthritis."  Plaintiff was instructed to return on the M.D. Line.  (Id., at 31.)  Two days later, Dr. John Symons examined Plaintiff,  who complained of slight worsening of his asthma and increasing joint pain.  Symons noted "a questionable history of rheumatoid arthritis."  Slightly worsened asthma was also noted, and the number of puffs on the inhaler was increased.  To check on the possibility of arthritis, labs and a rheumatoid panel were ordered.  In addition, an alphafetaprotein test was ordered, and Plaintiff was added to the Hepatitis-C clinic. The lab result came back with an ANA (the anti-nuclear antibodies test used for rheumatoid arthritis) of normal - at less that 1:40.  (Doc. No. 282-3 at 32.)

Defendant Mills examined Plaintiff on January 8, 2002, and noted Plaintiff claimed to have been diagnosed with CFS and stated that he was always tired.  He was in no acute distress and had no specific complaints.  Mills stated she would check his labs to rule out any organic cause for the fatigue and also ordered blood work.  She informed Plaintiff that fatigue could be caused by depression.  (Doc. No. 282-2 at 33; Doc. No. 282-3 at 18.)

On January 12, 2002 and January 14, 2002, Plaintiff had asthma checks by Watson and Cain, both physician assistants.  His medications were continued, and he was ordered to return to the asthma clinic in 3 months.  (Id. at 33-34.)  On January 22, 2002, Symons reviewed Plaintiff's

chart and ordered the RHU to schedule him to see Esther in the HCV clinic. Plaintiff thereafter saw Symons on February 8, 2002. At this exam, Symons made notations that Plaintiff's "labs acceptable," and that Plaintiff was willing to accept the psychiatric evaluation. As such, Symons ordered a consultation to clear Plaintiff for HCV treatment.[6] (Doc. No. 282-2 at 35.) On February 13, 2002, Plaintiff had an asthma-related visit with PA Cain.

Plaintiff was again seen by Cain on February 22, 2002, and claimed to have rheumatoid arthritis of his hands and feet. Cain noted, however, that Plaintiff's ANA had been negative as had his sed rate. Upon examination, his hands appeared normal. Nevertheless, Cain ordered follow up with a doctor. (Doc. No. 282-2 at 36.) On February 28, 2002, Plaintiff saw Dr. McGarvie and reported joint pain. He was schedule for M.D. Line. On March 7, 2002, Plaintiff was seen by Dr. Symons for his complaints of arthritis - specifically aches and pains in his joints and ankles. At the appointment, Symons noted that Plaintiff was in no acute distress, and had no inflammation of his joints. Symons assessed Plaintiff with mild degenerative joint disease, and ordered 400 milligrams of Motrin 4 times a day, as needed, for 90 days. (Id.)

The only other medical care that occurred thereafter at SCI-Huntingdon was (1) March 8, 2002, when Symons ordered a Hepatitis A total antibody and Hepatitis B surface antigen test (Doc. No. 282-2 at 36) and (2) March 19, 2002, when Symons ordered a second set of labs and a urinalysis. (Doc. No. 282-3 at 28-30.) Plaintiff was transferred to SCI-Greene on April 4, 2002. (Doc. No. 282-2 at 37.) All medical visits and treatment during the remaining relevant time period were related to his asthma condition with notations made in the record regarding Plaintiff's failure to consent for psychiatric release for Hepatitis-C treatment. (Id. at 41.)

---

[6] The medical chart reveals that Plaintiff later refused the psychiatric evaluation.

Plaintiff opposes Defendants' summary judgment motion by submitting a brief and his own declaration made under penalty of perjury with attached exhibits.[7] (Doc. No. 333). The exhibits consist of Progress Notes from his medical record for the dates of January 7, 2002, March 21-22, 2001 and November 15, 2001. (Id., Exs. 1, 3 and 5.) He also attaches a copy of a grievance he submitted on April 4, 2001 (#0347-01) and the response thereto (Id., Ex. 2), and another grievance he submitted on November 15, 2001 (#7729) (Id., Ex. 4). The only other exhibit is a copy of a Release for Responsibility for Medical Treatment form dated January 29, 2000, that Plaintiff refused to sign. (Id., Ex. 6.)

Plaintiff has also filed a supplemental brief in opposition to Defendants' motion (Doc. No. 339) and attaches a second declaration made under penalty of perjury with several exhibits. The exhibits are copies of internet articles on Rheumatoid Arthritis, Chronic Fatigue Syndrome and Hepatitis C (Id., Exs. 1, 2, 5-8 ), a copy of a dispensary card for the dates of August 20, 1989 and August 24, 1989 (Id., Ex. 3), a laboratory report dated August 16, 1989 (Id., Ex. 4), and a copy of a blank sick call request form (Id., Ex. 9). A second supplemental opposition brief was filed on October 6, 2008. (Doc. No. 345.)

Pursuant to M.D. Pa. L.R. 56.1, the papers opposing a motion for summary judgment shall include a separate statement of material facts responding to the numbered paragraphs set forth in the statement submitted by the moving party, and shall include references to the parts of the record that support the statements. While Plaintiff does not submit a separate statement,

_____

[7] In the body of his brief when opposing Defendants' motion with respect to the equal protection claim, Plaintiff states that he also relies on the arguments he previously set forth with regard to this issue in his brief in opposition to the Correction Defendants' motion for summary judgment. (Doc. No. 335 at 13-14.)

he does appear to set forth statements within his declarations that contradict certain facts contained in Defendants' statement.  (Doc. 333, Ex. A, Iseley Decl.)  Because Plaintiff proceeds pro se, the Court will liberally construe his declarations to also include his opposing statement of facts.  See Haines v. Kerner, 404 U.S. 519, 520-21 (1972).  The Court will now address the summary judgment motion viewing the facts in the light most favorable to Plaintiff based upon the support found in the record.

### 1.    Fibromyalgia

The undisputed facts of record reveal that in the extensive medical records of Plaintiff, the only reference to a diagnosis of fibromyalgia was on April 26, 1999 at SCI-Mahanoy by Dr. Diaz.  His assessment at that time was "right-sided cervical and shoulder fibromyalgia." Plaintiff was treated with Motrin and Robaxin to treat the soreness.  Other than this one episode, the vast compilation of medical records, including progress notes and physician's orders, fail to reveal any complaints made by Plaintiff of suffering from fibromyalgia or requesting treatment for any such condition.  Even in the subsequent visits with Diaz, fibromyalgia was never mentioned again.  The undisputed record demonstrates that upon intake when transferred to a new prison, Plaintiff cited his chronic conditions to consist of asthma, arthritis and HCV, without mention of fibromyalgia.  (Doc. No. 282-2 at 13, 24, 29 and 37.)  Despite the numerous medical visits documented in the record, there are no complaints noted by the doctors, physicians assistants and nurses which would substantiate Plaintiff's claims.  While Plaintiff consistently argues in his briefs and declarations that he did advise Defendants Mills and Roemer of his fibromyalgia diagnosis, and requested treatment for the symptoms thereof, it is well-established that conclusory, speculative allegations in

affidavits and moving papers, without more, in the face of documentary evidence, are insufficient to create a genuine issue of fact and defeat summary judgment. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990).

Beyond Plaintiff's bare assertions, there is nothing in the record to suggest deliberate indifference on the part of the moving Defendants. There are no specific allegations in the complaint that Defendant Mills failed to treat Plaintiff for fibromyalgia. Even if there were, the medical records reveal that on each occasion Mills saw Plaintiff while he was incarcerated at SCI-Huntingdon, she examined him, noted his concerns and proceeded to provide him with any necessary treatment.

Although Plaintiff does allege that Defendant Roemer and other SCI-Huntingdon medical personnel not named as defendants in this action failed to treat him for fibromyalgia, the undisputed record reveals the contrary. On each occasion, the Progress Notes demonstrate that Plaintiff was thoroughly examined and provided treated as required. There is no documentation of any complaints made by Plaintiff to Roemer or any other SCI-Huntingdon employee of fibromyalgia. However, the record is replete with support for the fact that Plaintiff was examined by Roemer and other medical staff on many occasions, and provided evaluation/treatment for other complaints/conditions including asthma, arthritis, fatigue and HCV.

Plaintiff attempts to counter the undisputed record by arguing that Defendants believe they are entitled to summary judgment merely because Dr. Diaz assessed and treated him for fibromyalgia at SCI-Mahanoy, and therefore they are not responsible for this condition. However, this is not Defendants' position. They simply reference these facts in an effort to

demonstrate that the record only contains one mention of this condition by one physician over the entire course of Plaintiff's medical treatment through the years. This raises the issue of whether Plaintiff ever suffered from, or continued to suffer from, fibromyalgia in light of the extensive medical records which came thereafter. Regardless, the only relevant issue here is whether Defendants provided adequate medical care to Plaintiff with respect to the complaints he presented to them.

Plaintiff also attempts to create an issue of fact by arguing that Roemer deliberately failed to note his complaints in the medical records in an effort to conceal his denial of treatment for fibromyalgia. Such unsupported assertions cannot defeat summary judgment in light of medical records directly contradicting Plaintiff's conclusory allegations. See Jones v. Hendricks, 173 Fed. Appx. 180, 183 (3d Cir. 2006)(finding that prisoner failed to meet burden of showing genuine issue for trial despite assertion that prison documents falsified since failed to offer any material challenging veracity of prison files); see also Chima v. Obedoza, 72 Fed. Appx. 577, 578 (9th Cir. 2003)(court upheld grant of summary judgment where medical records directly contradicted Plaintiff's conclusory assertions of "wholly false" medical records). In the instant case, there is simply no evidence to suggest that Roemer deliberately concealed or falsified Plaintiff's medical records. In fact, the medical records clearly reflect the opposite. Each entry made by Roemer concerning a visit with Plaintiff was thorough, extensively setting forth complaints voiced by Plaintiff and treatments prescribed. For all of these reasons, the Court finds that Defendants are entitled to summary judgment with respect to Plaintiff's Eighth Amendment medical claim regarding fibromyalgia.

### 2. Chronic Fatigue Syndrome

In examining the evidentiary materials before the Court, it is undisputed that Plaintiff was diagnosed with "possible chronic fatigue syndrome" in June of 1999 by Dr. Diaz while confined at SCI-Mahanoy. He was directed to take a multivitamin and be re-checked in a month. A follow-up appointment for CFS was conducted on July 19, 1999. After the examination, the assessment by Diaz was "chronic fatigue syndrome." (Doc. No. 282-2 at 6, 45.) He was treated with a Vitamin B-12 shot and scheduled for shots at 6 week intervals for the next year. When Plaintiff was transferred to SCI-Coal in March of 2000, he made no mention of suffering from CFS. For the remainder of his incarceration at SCI-Coal, there were only a few occasions when Plaintiff complained of fatigue, one in April and three in May of 2000. He did not claim to be suffering from CFS . His examinations were normal on each occasion, and he was treated with Motrin and scheduled to be seen on M.D. Line. The assessment was fatigue, with a note that he had a history of HCV. Thereafter, treatment for HCV and the complications therefrom were discussed with Plaintiff, and blood work and a psychological consult for Hepatitis-C treatment ordered. Blood tests for thyroid-related conditions were also ordered. After reviewing the lab work, no new treatment or orders were issued.

In carefully sifting through Plaintiff's medical records, despite the numerous medical visits documented during this time period, there is no further mention of CFS or complaints related thereto until January 8, 2002, during the course of a visit by Defendant Mills with Plaintiff in the G-Block Unit at SCI-Huntingdon. Mills makes a notation in the medical record that Plaintiff claims to have been diagnosed with CFS, is tired all of the time and desires treatment. In response thereto, Mills noted that Plaintiff was without specific complaints. She

19

checked his labs to rule out any organic cause for the fatigue, and ordered blood work. She also informed Plaintiff that depression could be responsible for the fatigue. The subsequent lab work performed failed to provide any evidence of an organic disease that could be causing the fatigue. During the course of the subsequent visits by Plaintiff to medical following his visit with Mills on January 8, 2002, Plaintiff failed to complain of any symptoms that could be attributable to CFS. He never complained of tiredness or fatigue.

The above undisputed facts fail to demonstrate any deliberate indifference by Mills to a serious medical need of Plaintiff. Mills noted Plaintiff's complaints, and addressed them by ordering tests to determine if any organic causes existed for the fatigue. After the tests came back negative, Mills discussed the possibility that depression could be the source of the fatigue. Based on the foregoing, there is nothing in the record to suggest that Mills was deliberately indifferent to Plaintiff's medical needs. To the extent Plaintiff disagrees with the treatment received by Mills or believes a different type of treatment was warranted, he fails to state a claim under § 1983. See Durmer, 991 F.2d at 69.

The medical records further reveal that Plaintiff made no complaints of CFS or tiredness to Defendant Roemer during the relevant time period. The visits with Roemer and SCI-Huntingdon medical staff other than Mills related to Plaintiff's asthma, Hepatitis-C and arthritis conditions. As such, it is clear Roemer was not deliberately indifferent to any medical need of Plaintiff regarding CFS.

In opposing Defendants' motion for summary judgment with respect to the CFS issue, Plaintiff makes many unsupported assertions in his declarations including Defendants' deliberate concealment of his CFS diagnosis and symptoms, and their refusal to treat his

20

condition. The only documentary evidence he attaches which relate to this issue is a copy of a grievance and a response thereto regarding Plaintiff's claim that he requested treatment for chronic fatigue syndrome on March 22, 2001, and was denied treatment. (Doc. No. 333, Ex. 2.) The medical records reveal that Plaintiff was examined by Dr. Kimber on this date. (Doc. No. 282-2 at 24.) First, Kimber is not a defendant in this action. However, even if he were, the undisputed medical record reveals that there were no complaints made by Plaintiff of fatigue or having a previous CFS diagnosis. There were numerous notations made by Kimber regarding Plaintiff's asthma and HCV conditions, and the treatments he prescribed. Again, as discussed above regarding the fibromyalgia issue, there is simply no evidence to suggest Kimber falsified the records or deliberately concealed information. The undisputed evidence before the Court demonstrates that even if Plaintiff had previously been diagnosed with CFS, on the occasions Plaintiff did complain of fatigue to Defendants, he was evaluated and treated. Accordingly, summary judgment is warranted in favor of Defendants with respect to this claim.

### 3. Rheumatoid Arthritis

Plaintiff also claims that he suffered from rheumatoid arthritis ("RA"), and that Defendants were deliberately indifferent to this condition. There is nothing in the evidentiary materials before the Court to support Plaintiff's assertions. Defendants submit the medical records of Plaintiff spanning the time period from 1999 to the beginning of 2003. The relevant time period for purposes of the instant motion for summary judgment was Plaintiff's confinement at SCI-Huntingdon from March 21, 2001, until his transfer to SCI-Greene on April 4, 2002.

First, there are no claims contained in the complaint against Defendant Mills with respect to RA. With respect to Defendant Roemer, Plaintiff generally asserts that Roemer refused to treat his RA condition, and as a result, Plaintiff suffered severe, debilitating pain. (Doc. 76, Amended Compl. ¶ 72.) The first reference to any type of arthritis problem was by Plaintiff himself on March 14, 2000 upon his admission to SCI-Coal when he told the intake nurse he "had arthritis." Despite several medical visits over the next two (2) months, no complaints were made with regard to arthritis. On May 20, 2000, Plaintiff complained of "joint pain" among other symptoms, but exhibited no symptoms at the time of his medical appointment on said date. From that time until his transfer to SCI-Huntingdon in March of 2001, Plaintiff never voiced any complaints related to an arthritis condition. During the initial days of intake at SCI-Huntingdon, Plaintiff made no mention of suffering from arthritis. The only noted conditions with respect to Plaintiff were Hepatitis and asthma.

Plaintiff made numerous visits to medical from March of 2001 through December of 2001, which included general health examinations as well as tests and treatment. These visits were mostly related to his asthma condition. Included during the above time frame were two exams performed by Defendant Roemer. The first exam was on July 16, 2001, and pertained to Plaintiff's asthma condition. Prescriptions and a chest x-ray were ordered. There were no references to any complaints by Plaintiff regarding an arthritis condition. Roemer saw Plaintiff again on November 15, 2001. The records set forth a complete medical exam conducted by Roemer on this date which include references to Plaintiff's Hepatitis and asthma conditions, noting both to be stable. (Doc. No. 282-2 at 30.) Treatments were prescribed with respect to the asthma. Roemer noted that Plaintiff voiced no subjective complaints on this occasion,

other than becoming angry about Roemer's remark that Plaintiff was on the upper limits of normal weight for his stature. Roemer's only association with Plaintiff was on the above two (2) occasions. There is simply nothing in the record to suggest that Roemer was aware of any arthritis condition or failed to treat any symptoms or complaints with regard thereto.

In opposing the summary judgment motion Plaintiff submits a copy of a dispensary card completed during his confinement at SCI-Dallas. An entry made on August 7, 1989 by Dr. Anzalone states that Plaintiff complained of numbness of the right elbow, right knee and the left wrist and thumb. (Doc. No. 339-2, Ex. 3.) Tests were ordered which included a rheumatoid screen. In a second entry dated August 24, 1989, Anzalone notes "Pt informed about rheumatoid arthritis" and prescribes anti-inflammatories. (Id.) Plaintiff further attaches a copy of a lab report dated August 16, 1989, which reveals that in a specimen taken on August 11, 1989, Plaintiff had a positive rheumatoid marker at that time. (Doc. No. 339-2, Ex. 4.) These submissions do not create an issue of material fact for the following reasons. Even if Plaintiff had a positive RA test result in 1989, there is nothing to even remotely suggest that the moving Defendants were aware of this earlier test. Even if they were or should have been, it is undisputed in the records as they pertain to the moving Defendants that no complaints were made with regard to arthritis. Further, each time Plaintiff was seen by the Defendants, he was appropriately responded to, evaluated and provided any necessary treatment in response to his complaints. Accordingly, Defendants are entitled to summary judgment with respect to Plaintiff's Eighth Amendment rheumatoid arthritis claim in that there is no evidence of any deliberate indifference on their part.

**B.     ADA claims**

Plaintiff alleges that his conditions qualify as disabilities. (Doc. No. 74, Am. Compl. ¶ 89.) He claims that his rights pursuant to the ADA were violated when he was not provided with information and medical care for his disabilities. (Id. ¶ 98.)

The ADA prohibits the exclusion of otherwise qualified participants from any program or benefits on account of their disability. 42 U.S.C. § 12132. Title II of the ADA states, "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Thus, a claim under the ADA requires that: (1) the plaintiff has a disability; (2) the plaintiff is otherwise qualified for the program sought or would be qualified if the defendant made reasonable modifications to the program, and (3) the plaintiff was excluded from the program solely by reason of his or her disability. See Wagner v. Fair Acres Geriatric Center, 49 F.3d 1002, 1009 (3d Cir. 1995). Title II of the ADA applies to state prisons. Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998); Brown v. Pennsylvania Dep't of Corr., 290 Fed. Appx. 463, 467 (3d Cir. 2008).

Plaintiff's argument that the denial of treatment for his ailments violated the ADA fails. Even assuming that Plaintiff is disabled within the meaning of the ADA, there is no evidence in the record that he was excluded from any program on the basis of his disabilities. Rather, he claims that he was denied or provided inadequate medical treatment for his disabilities, which is not encompassed by the ADA's prohibitions. See Iseley v. Beard, 200 Fed. Appx. 137, 142 (3d Cir. 2006); Bryant v Madigan, 84 F.3d 246, 249 (7th Cir. 1996)(holding that "the [ADA] would not be violated by a prison's simply failing to attend to the medical needs of its disabled

24

prisoners ... [t]he ADA does not create a remedy for medical malpractice.") Accordingly, summary judgment will be granted with respect to the ADA claims.[8]

### C.      Equal Protection claim

In the complaint, Plaintiff alleges that his equal protection rights were violated when he was denied medical care because of his race by Defendant Roemer.  (Doc. No. 76, Am. Compl. ¶¶ 73, 100.)  Specifically, he claims that Roemer referred to him as a "nigger." (Id. ¶ 73.)

The Equal Protection clause of the Fourteenth Amendment requires all persons "similarly situated" to be treated alike by state actors.  See City of Cleburne, Tex. v. Cleburne Living Center, 473 U.S. 432, 439 (1985).  To state an equal protection claim a plaintiff must allege that: (1) he or she was a member of a protected class, (2) he or she was treated differently from similarly situated persons outside of his or her protected class, and (3) the resultant discrimination was purposeful or intentional rather than incidental.  Tillman v. Lebanon County Corr. Facility, 221 F.3d 410, 423-24 (3d Cir. 2000).  Mere harassment based on protected-class status without identification of similarly situated individuals outside the class will not support an equal protection claim.  See Hudson v. Coxon, 149 F. Appx. 118, 121 (3d Cir. 2005)(upholding dismissal of equal protection claims for failure to allege differential treatment of others similarly situated).[9]

---

[8]  Defendants' argument that the ADA does not permit public employees or supervisors to be sued in their individual capacities is also well-taken as the ADA forbids discrimination by "any public entity" and, as such, the only proper defendant is that entity.  See Williams v. McLemore, 247 Fed. Appx. 1,8 (6th Cir. 2007); Walker v. Snyder, 213 F.3d 344, 346 (7th Cir. 2000).

[9]  Recently, this Court dismissed a plaintiff's equal protection claim despite his allegations of racial harassment because he failed to allege that he received treatment different from that given to other individuals outside the protected class.  See Banks v. One or More

In the instant action, Plaintiff's equal protection claim is solely based on Roemer's alleged racial remarks. It is first well-established that verbal abuse, no matter how derogatory, do not state actionable claims under § 1983. Saley v. Pa Dep't of Corrections, 181 Fed. Appx. 258, 266 (3d Cir. 2006); Balliet v. Whitmire, 626 F. Supp. 219 (M.D. Pa. 1986).

Further, while Plaintiff alleges his class-based status as an African-American, he fails to present any evidence of similarly situated individuals outside of his protected class that were treated differently by Defendants. He merely offers an unsupported assertion that Roemer made the alleged racial remarks, and no evidence whatsoever of occasions of differential treatment of individuals outside his class. Moreover, as discussed above, the undisputed record demonstrates that on the two occasions Roemer did see Plaintiff, he provided a thorough evaluation and any necessary treatment. Accordingly, summary judgment is warranted in favor of Defendants on this claim.

**D.      State claims**

Plaintiff also includes in his complaint several state law claims against moving Defendants. For the same reasons set forth in the Memorandum and Order issued on June 15, 2009, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. Plaintiff shall have the opportunity to pursue those claims in a Pennsylvania court of competent jurisdiction, if he so chooses, in accordance with 28 U.S.C. § 1367(d). An appropriate Order will follow.

---

Unknown Named Confidential Informants of Federal Prison Camp Canaan, No. 1:06-cv-1127, at 9 (M.D. Pa. 2008).

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CHARLES ISELEY,** | : | **CIVIL NO. 1:CV-02-2006** |
| **Plaintiff,** | : | |
| | : | **(Chief Judge Kane)** |
| **v.** | : | |
| | : | |
| **JEFFREY BEARD, et al.,** | : | |
| **Defendants** | : | |

## <u>ORDER</u>

**AND NOW,** this 29th day of September, 2009, upon due consideration of the motion for summary judgment filed by Defendants Mills, Roemer and Wexford, and for the reasons set forth in the accompanying Memorandum, **IT IS HEREBY ORDERED THAT:**

1.  Defendants' motion for summary judgment (Doc. No. 280) is **granted** with respect to all claims except the state law claims.  The Clerk of Court shall defer entering summary judgment on behalf of said Defendants until the conclusion of this case.

2.  Plaintiff's remaining state law claims are **dismissed without prejudice** to Plaintiff pursuing said claims in state court in accordance with 28 U.S.C. § 1367(d).


S/ Yvette Kane_____
YVETTE KANE, Chief Judge
Middle District of Pennsylvania